## AEROPESCA LIMITED *v.* BUTLER AVIATION INTERNATIONAL, INC. ET AL.

[No. 561, September Term, 1979.]

*Decided February 6, 1980.*

The cause was argued before GILBERT, C. J., and THOMPSON and LOWE, JJ.

*Note: *Certiorari* denied, Court of Appeals of Maryland, June 2, 1980.

*T. Joseph Touhey,* with whom were *Donald M. Lowman* and *Touhey, Rushworth & Lowman* on the brief, for appellant.

*Donald L. DeVries, Jr.,* with whom were *Charles E. Iliff, Jr.,* and *Semmes, Bowen & Semmes* on the brief, for appellees.

GILBERT, C. J., delivered the opinion of the Court.

## — THE PREFACE —

This case may have had its origin when Icarus on wings of feather and wax, fashioned by his father Daedalus, made his ill-fated flight.[1] In the matter now before us, Aeropesca Limited, a Colombian corporation (ALC) made what might well have been, depending upon what version of events one believes, an ill-fated flight from Baltimore-Washington International Airport to Miami, Florida, and, thereafter, to Bogota, Colombia. The flight was commenced only after the appellee and cross-appellant, Butler Aviation International, Inc. (Butler), represented to the Federal Aviation Administration (FAA) that ALC's Vickers Viscount airplane was "airworthy" when in point of fact it was not.

Understandably aggravated by what it must have viewed as a "rip-off," ALC sued Butler[2] in the Circuit Court for Anne Arundel County alleging in one count that Butler breached its contract and in the other count, an action of fraud and deceit. The case was tried non-jury before Judge Raymond G. Thieme, Jr. The judge concluded that ALC was entitled to one hundred dollars ($100) damages on the breach of contract count, and seventeen thousand one hundred twenty dollars and sixty-two cents ($17,120.62) damages in the tort action. Judge Thieme rejected ALC's claim for punitive damages opining that despite Butler's "reprehensible" conduct, motivated by "greed," no evidence of *actual* malice was

[1]. Icarus, so the story goes, flew too close to the sun. The wax melted, and he plunged to his death in what is now known as the Icarian Sea. *II Dictionary of Greek & Roman Biography and Mythology* 559 (1849).

[2]. Also included as parties defendant in the suit were Butler International Inc., Butler Aviation — Miami, Inc., Butler Aviation-Friendship, Inc., Butler Aviation Baltimore-Washington, Inc.

presented nor would the "existence of *implied* malice" support punitive damages. (Emphasis supplied.)

ALC, in this Court, has raised five issues for our review. Four of them are concerned with punitive damages, the fifth relates to the matter of compensatory damages for breach of contract. We think the four issues regarding punitive damages may be combined and stated simply as: Did the trial judge err in his interpretation of the law insofar as the assessment of punitive damages is concerned?

Butler has also appealed and it puts three issues to us, namely: 1) that the proof failed to supply the "essential elements of actionable fraud"; 2) a failure to perform, or to perform properly, that which one had agreed to perform is not fraudulent; and 3) ALC, a non-registered foreign corporation, is precluded from maintaining an action in the courts of Maryland.

## — THE FACTS —

With minor editing, we adopt Judge Thieme's "Statement of Facts," as it appears in his "Memorandum and Order":

"[ALC] is . . . engaged in transporting freight and passengers in Colombia and to surrounding South American countries. Its offices are in Bogota. At the time of the trial the corporation's airplanes consisted of two C-46s and four Vickers Viscounts. These aircraft are four engined turbo-jet passenger liners each capable of carrying approximately fifty-two passengers. During the early part of 1974 . . . [ALC] was anxious to have major maintenance work done on HK1319, one of its Viscounts.

Representatives of . . . [Butler] travelled to Bogota where an agreement was reached on the work to be done on HK1319. . . . At this time . . . [ALC] expressed its interest in purchasing another Viscount. The . . . [Butler] representatives advised . . . [ALC] of some Viscounts that were available within a price range of $60,000 — $75,000. It is . . . [one of those] Viscount[s] which eventually became the subject matter of this suit.

Upon their return to the States, John Wightman, a sales representative for ... [Butler], confirmed their discussions regarding the purchase of another Viscount..., indicating the manner of payment and the cost of the plane would be $70,000.00. An estimated additional $20,000.00 to $30,000.00 would be required to license the aircraft for export to Bogota.

When Viscount HK1319 was brought to ... [Butler's] facilities in Baltimore for the contracted repairs, representatives of ... [ALC] accompanied it for the purpose of pursuing the matter of the purchase of another Viscount. From Baltimore they were taken to Georgetown, Delaware by ... [Butler]. There, based upon the assurances of ... [Butler] that Viscount N7440 was the best as well as the easiest to ferry away for necessary repairs, ... [ALC] subsequently entered into an agreement with Samuel Goldman, representative of Viscount International Corporation which owned the plane, ... for its purchase for $62,000.00.... Subsequent discussions regarding the necessary repairs ... [were] had back in Baltimore.... [ALC] was assured by ... [Butler] that the total cost of the plane and the necessary repairs which were to be done by ... [Butler] would be $90,000.00. After their return to Bogota, ... [ALC] received the contract from ... [Butler on May 8, 1974] ... which [ALC] accepted in Bogota.... [Butler] forwarded a statement to ... [ALC on May 29, 1974, which showed] ... the status of the accounts between them on both the HK1319 and the newly purchased Viscount N7440.

In response to an August 2, 1974, notification from ... [Butler] that N7440 was ready, Captain Sarmiento, an ... [ALC] pilot, arrived in Baltimore around August 14, 1974, to fly the plane back to Bogota. At ... [that] time ... [Butler] requested additional monies for labor and parts on N7440. A dispute then arose over the additional work claimed

to have been performed and whether ... [the agreement] was a fixed price contract or a cost-plus contract.... [E]ventually ... [ALC] ... [was] required to place $25,000.00 in escrow ... so that the plane could be released.... No bill was ever shown to have been prepared by ... [Butler] and to have been submitted to ... [ALC] for ... [that] additional work.

... [Butler], on August 19, 1974, certified that Viscount N7440 was airworthy.... As a result of a test flight on August 23, 1974, discrepancies were found in the operation of the plane.... They were: pressurization inoperative due to an inoperative door seal, controls heavy; difficulty in trimming the plane, fuel gauges inoperative and the oleo switch (controls braking of the plane upon landing through the propeller pitch).... [ALC] was assured by ... [Butler] that ... [the deficiencies] would be corrected.... [T]here is no evidence [, however,] that ... [Butler] attempted to correct ... [the] problems after the test flight on August 23, 1974, and prior to the release of the aircraft for flight from Baltimore to Miami ... [a month later]. An Export Certificate of Airworthiness was issued by the Federal Aviation Administration on September 10, 1974, for Viscount N7440 (a/k/a 745D).

... [On board the aircraft in its flight to Miami] were Captain Sarmiento and his co-pilot, both employees of ... [ALC], Raymond DeLuna, an avionics technician employed by ... [Butler], who, among other duties, was on the flight '... to see anything that might be wrong with the aircraft in the flight and to note it and then notify Mr. Burns and then repair it.' ... Colonel Diaz, his wife and children, Colombian nationals returning home and Captain Marovitch, a pilot required to be on board under FAA regulations.

During the course of the flight, problems again occurred with the plane. The Aircraft Log Book ...

indicate[s] that the following items were inoperative on the flight to Miami: The DME (a navigational device), the spill valve (controls intake of outside air), pressurization (the door liner failed to inflate and seal the door), fuel gauges, fuel trim on engine #2, controls heavy, stall warning, tachometer, radar, autopilot, ADF (a navigational device) and some radio channels on the VHF equipment, air stair, left oleo switch (controls the braking action of the propeller upon landing), hydraulic system had low pressure (hydraulic fluid was discovered, after landing, on the exterior of the fuselage skin from the nose to the tail), corrosion around the toilet, dead flashlight batteries and noise in the elevator trim tab.

The . . . Aircraft Log Book indicate[s] that . . . [the] items were subsequently repaired by Air Tech in Miami, an independent contractor retained and paid by . . . [Butler] after efforts by . . . [Butler] employees sent from Baltimore to correct the problems proved unsuccessful. Testimony showed that some of . . . [the] items affected the airworthiness of the plane.

On October 29, 1974, the plane, flown by Captain Sarmiento, left Miami for Bogota. Again, some of the items initially complained of after the Baltimore test flight of August 24, 1974, were plaguing the plane. . . . Specifically: The ADF was inoperative, and the pressure system was inoperative and an engine had to be feathered in flight. However, Captain Sarmiento did indicate that on the flight to Bogota there was no longer a problem with the controls. Upon its final landing in Bogota, the plane was inspected by Jose Escolar, . . . [ALC's] Director of Maintenance. He testified to various items . . . which in his opinion rendered the plane unairworthy. The plane was . . . grounded in Colombia for a considerable period of time."

I.

## —ALC'S ELIGIBILITY TO PROCEED IN MARYLAND COURTS —

We shall first consider Butler's third issue inasmuch as should it be decided favorably to Butler, the case is at an end. Butler asserts that because ALC failed to register as a foreign corporation doing business in this State, pursuant to Md. Corp. & Ass'ns. (1975) Code Ann. § 7-202, it is precluded from maintaining an action in the Maryland courts. Md. Corp. & Ass'ns. (1975) Code Ann. § 7-301. The trial judge rejected Butler's argument, and so do we.

Section 7-202 of Md. Corp. & Ass'ns. (1975) Code Ann. provides:

"(a) *Registration required.* — Unless it is qualified to do business under § 7-203 of this subtitle, before doing any interstate or foreign business in this State, a foreign corporation shall register with the Department.

(b) *Manner of registration.* — To register, the corporation shall certify to the Department:

(1) The address of the corporation; and

(2) The name and address of its resident agent in this State.

(c) *Period for which registration effective.* — Unless terminated by the corporation, the registration is effective as long as the corporation has a resident agent in this State."

Section 7-203 states:

"(a) *Qualification required.* — Before doing any intrastate business in this State, a foreign corporation shall qualify with the Department.

(b) *Manner of qualification.* — To qualify, the corporation shall:

(1) Certify to the Department:

(i) The address of the corporation; and

(ii) The name and address of its resident agent in this State;

(2) File with the Department a certificate which:

(i) States that the corporation is in good standing under the laws of the place where it is organized; and

(ii) Is executed by the official of that place who has custody of the pertinent records; and

(3) File with the Department an officially certified statement which specifies the date and record reference of:

(i) Its charter or, if not incorporated, the instrument under which it is organized; and

(ii) Each amendment and supplement to the charter or instrument under which it is organized.

(c) *Period for which qualification effective.* — Unless terminated by the corporation, the qualification is effective as long as:

(1) The corporation has a resident agent in this State;

(2) The corporation does not forfeit its right to do intrastate business under the laws of this State; and

(3) If the corporation qualifies or changes its name after June 1, 1951, the name of the corporation complies with the requirements of Title 2 of this article relating to corporate names."

The Legislature has mandated sanctions against foreign corporations who do business or have done business in Maryland, without complying with section 7-203. The sanctions are set forth in section 7-301 of the Corp. and Ass'ns. portion of the Code. That section provides:

"If a foreign corporation is doing or has done any intrastate, interstate, or foreign business in this State without complying with the requirements of Subtitle 2 of this title, neither the corporation nor any person claiming under it may maintain a suit in any court of this State unless it shows to the satisfaction of the court that:

(1) The foreign corporation or the person claiming

under it has paid the penalty specified in § 7-302 of this subtitle; *and*

(2) Either:

(i) The foreign corporation or a foreign corporation successor to it has complied with the requirements of Subtitle 2 of this title; or

(ii) The foreign corporation and any foreign corporation successor to it are no longer doing intrastate, interstate, or foreign business in this State." (Emphasis supplied.)

Patently, in order for Butler to prevail in its contention that ALC may not pursue an action in the courts of this State, we must find that ALC's purchase of and repair to the Viscount constituted "doing business" within the meaning of section 7-301.

The evidence showed that ALC contracted with Butler to replace a center lower spar on one of ALC's Viscounts. Subsequently, ALC purchased a Viscount for $62,000 and contracted with Butler for major repairs to the aircraft.

ALC, insofar as we are aware, does not maintain an office in Maryland, nor does it schedule flights from or to Maryland. All that it seems to have done was to contract with a Maryland concern to have a wing spar replaced on one plane and to have purchased a second plane that was to undergo extensive repair by Butler. Short of those two transactions, ALC has no contact with Maryland. It does not solicit, perform, or transact business in this State on anything approaching a regular basis. Indeed, it is difficult to characterize ALC's isolated dealings with Butler as even sporadic.

The statutory provisions relating to foreign corporations "doing business" in Maryland, Md. Corp. and Ass'ns. Code Ann. §§ 7-202, 7-203, and 7-301, were never intended to bar foreign corporations from entering into an occasional contract with Maryland businesses and, when necessary, pursuing in Maryland courts, rights under that contract or actions arising out of it. Were the law otherwise, commerce between Maryland based companies and those dehors the geographical confines of this State would cease abruptly. The

deleterious effect of such a law is too obvious to require further comment.

*G.E.M., Inc. v. Plough, Inc.,* 228 Md. 484, 486, 180 A.2d 478, 480 (1962) states that: "Whether a foreign corporation may maintain a suit without qualifying or registering clearly depends upon whether it is 'doing business' as defined in the cases on the subject." *See International Shoe Co. v. Washington,* 326 U.S. 310, 66 S. Ct. 154, 90 L. Ed. 95 (1945). *G.E.M.* makes manifest that each case must stand or fall on its own facts.

When the facts in the matter now before us are weighed, the scale tilts against a conclusion that ALC was "doing business" within this State for the purposes of section 7-301. Hence, it is not precluded from proceeding in Maryland courts in order to obtain redress for alleged wrongs done to it by Butler.

## II.

## — LAW OF FRAUD AND DECEIT —

Judge Pattison, writing for the Court of Appeals in *Gittings v. Von Dorn,* 136 Md. 10, 15, 109 A. 553, 554 (1920), distilled a number of that Court's prior cases involving fraud and deceit [3] into the five elements now recognized as necessary to maintain such an action. The Court, in *Gittings,* declared:

> "To entitle the plaintiff to recover [in an action for fraud and deceit] it must be shown: (1) that the representation made is false; (2) that its falsity was either known to the speaker or the misrepresentation was made with such a reckless indifference to truth as to be equivalent to actual knowledge; (3) that it was made for the purpose of defrauding the person claiming to be injured thereby; (4) that such person not only relied upon the

---

3. The other cases are:

Boulden v. Stillwell, 100 Md. 543, 60 A. 609 (1905); Cahill v. Applegarth, 98 Md. 493, 56 A. 794 (1904); Robertson v. Parks, 76 Md. 118, 24 A. 411 (1892); Buschman v. Codd, 52 Md. 202 (1879); McAleer v. Horsey, 35 Md. 439 (1872).

misrepresentation, but had a right to rely upon it in the full belief of its truth, and that he would not have done the thing from which the injury resulted had not such misrepresentation been made; and (5) that he actually suffered damage directly resulting from such fraudulent misrepresentation."

What *Gittings* espoused sixty years ago is still the law of Maryland today. *See James v. Weisheit,* 279 Md. 41, 44, 367 A.2d 482, 484 (1977); *Wedeman v. City Chevrolet Co.,* 278 Md. 524, 532, n. 5, 366 A.2d 7, 12, n. 5 (1976); *James v. Goldberg,* 256 Md. 520, 528-29, 261 A.2d 753, 758 (1970); *Suburban Properties Management, Inc. v. Johnson,* 236 Md. 455, 460, 204 A.2d 326, 329 (1964); *Lambert v. Smith,* 235 Md. 284, 287, 201 A.2d 491, 493 (1964).

## — EVIDENCE OF FRAUD IN THE INSTANT CASE —

The evidence adduced by ALC showed that in April 1974, it had entered into a contract to purchase, through Butler, a Vickers Viscount 745, a four-engine turbo prop aircraft capable of carrying 52 passengers.[4] The Viscount's purchase price was $62,000. Butler agreed that for the total sum of $90,000, ALC could buy the plane and have it repaired to the point where is was in an "airworthy condition." Butler notified ALC in August 1974 that the aircraft was ready for delivery and a FAA export certificate. On August 14, 1974, two pilots from ALC arrived at BWI [5] in order to take delivery of the Viscount on behalf of ALC. The balance of the purchase-repair price was tendered Butler, but Butler refused to deliver the plane unless it received an additional $40,000 that Butler claimed was due because of cost overruns. ALC retained local counsel, and after some discussion, an agreement was reached whereby ALC deposited the sum of $25,000 [6] in an escrow account. The escrow money was to be released upon judicial determination of the contract dispute.[7]

---

**4.** The Vickers Viscount is of British manufacture. The particular plane involved in this appeal had an American Registry, No. 7440.

**5.** Baltimore-Washington International Airport.

**6.** The $25,000 was over and above the $90,000 amount previously agreed upon between the parties.

**7.** Judge Thieme, in deciding the matter *sub judice* directed the return of the $25,000 escrow amount to ALC.

Finally, on August 23, 1974, ten days after their arrival at BWI, the ALC pilots, along with Butler employees and a Captain John Moravitz, retained by Butler, went aloft on a test flight. Prior to the test the Viscount had been certified by Butler employees as "airworthy" and in compliance with FAA's directives. During the test flight a number of "squawks"[8] were noted. The nature of some of the "squawks," in the view of the ALC pilots, was such as to make the plane "unairworthy" and in need of additional repair.[9] ALC was assured by Butler that the "squawks" would be corrected. There is, however, no evidence in the record to indicate that Butler ever undertook to make the necessary corrections. Nevertheless, an "Export Certificate of Airworthiness" was issued by the FAA on September 10, 1974. The application for the certificate was signed by "E. Karl Dirksen, Chief Inspector," and it represented that the aircraft had received "a satisfactory flight test on 8-23-74."

Mr. Dirksen testified that he was employed at the time of the application in the Inspection Department of Butler. Dirksen said that he "held the title of Chief Inspector for pay purposes only. . . ." Dirksen told Judge Thieme that a Mr. Tom Caine was the chief inspector in fact, although Caine's title had been changed, for pay purposes, to "manager of quality control." Dirksen was licensed by the FAA. He was authorized by Butler to certify to the customer or to the FAA as to the airworthiness of planes. Dirksen acknowledged that although he signed the application and certified as to the airworthiness of the aircraft, he did not inspect the Viscount

---

8. A "squawk," we infer, is a problem in the performance or a condition of the aircraft in general or some part in particular, and about which the aircrew "squawks" or complains.

9. Those "squawks" so viewed by the pilots were:

   a. ". . . no pressurization in the plane";

   b. "controls very heavy . . . and very difficult to trim the plane";

   c. "corrosion in the skin of . . . [the] plane . . . [was] very bad";

   d. propeller going to zero "ground fine pitch . . . [,] [t]hat means that a propeller can be in zero degrees in flight and is possible to take off a wing of the aircraft";

   e. fuel gauges were not functioning;

   f. "a problem with that spill valve";

   g. "weight and balance" of aircraft so as to determine center of gravity of the plane.

upon completion of the work by Butler. No one ever discussed with him the discrepancies that were detected during the test flight. He made the application for the FAA certificate solely on the basis of Tom Caine's request that he do so. Dirksen was "sure" that Tom Caine did not inspect the Viscount.

Mr. Raymond A. DeLuna, who was employed by Butler as avionics manager at the time pertinent to this case, testified that the Viscount "was brought to Butler to be worked on, to make it airworthy and to repair as necessary." He said that he was told by Butler's vice president, Jim Burns, that there was a contract which was a "package deal," [10] and that "[he had] . . . to hold the cost low." DeLuna stated that he did some things differently than what he normally would have done on a cost-plus job. He gave as an example that he would have "repaired . . . [the] radar instead of just patching it up so I could just get up off the ground." Additionally, DeLuna would have installed "the proper type of radio; and . . . would have overhauled the omnis." [11] During the course of "repairing the auto pilot . . . [he] found out that . . . [it] was not able to control the aircraft." The "ailerons were able to control the aircraft" but "the rudder" could not "control" it; "the elevators were heavy . . ." as was "the rudder. . . ." "The rudder is what guides the aircraft." DeLuna related that he was told that the cause of the problem might be the "servos" and to take it off of another plane and put it on the Viscount. Following the test flight, a meeting of some of the staff was held by Vice President Burns. At that time he gave "the order to correct" the deficiencies found during the test flight. DeLuna said that "what happened was that somebody goofed and notified . . . [ALC] to come pick-up the plane when the plane wasn't even ready. . . ." The ALC pilots were "hustle[d] . . . out to New York" while "we tried to put the airplane together." The "servos" was again changed but "it didn't work." Prior to the time of take off on the flight to Miami, DeLuna told Burns that "the airplane was [not] safe to fly . . . because . . . [DeLuna] had . . . [his] reasons." Burns told

10. A "package deal," Mr. DeLuna said, meant that it was on the basis of a fixed price and not a cost-plus.
11. An "omni" is a "360 degree directional signal."

him that it was ready, and that another employee, Chuck Hausholter, the maintenance manager, said that "everything that was wrong with . . . [the plane] has been corrected."

DeLuna was one of the Butler employees who was in the Viscount on its flight to Miami. The events that occurred on the flight convinced DeLuna that the deficiencies noted in the test flight had not, in fact, been corrected. He opined that the plane was not airworthy notwithstanding the certificate issued by the FAA on the strength of Butler's application. DeLuna further said that had he not been told by Hausholter that "everything . . . was okay," he "wouldn't have gone on the flight."

The pilot, Captain Mario Sarmiento, gave testimony similar to that of DeLuna insofar as the controls, rudder, and auto pilot were concerned. The Captain also said that when they reached Miami, after a low level flight caused by the failure of cabin pressure, they made an emergency landing because of the faulty rudder. Every other person on the plane, except Captain Moravitz, verified the difficulties experienced during the flight to Miami. Captain Moravitz's testimony was so contradictory of the other's that one wonders if he described the same flight. Extensive repairs were made in Miami by Butler or its agents. When the plane was again "ready" for flight it was taken to Colombia. Enroute an engine failed but the plane continued to its destination.[12] Once there, widespread repairs were made in order for the Viscount to pass inspection by the Colombian authorities.

The majority of the States permit fraud and deceit to be proven by a preponderance of evidence. *Loyola Federal Savings and Loan v. Trenchcraft,* 17 Md. App. 646, 656, 303 A.2d 432, 438 (1973); 37 Am. Jur. 2d. 642 (1968). Maryland, however, does not follow the majority. It has established that in such cases the burden is on the plaintiff to prove his case by *clear and convincing evidence.*[13] *Peurifoy v. Congressional*

---

12. The description of the flight recalls to mind a World War II song, "Coming in on a Wing and a Prayer," by Harold Adamson (words) and Jimmy McHugh (music). *The Variety Music Cavalcade* 1620-1961. (Ed. Julius Mattfeld, Prentice Hall, 1962).

13. For a brief discussion of what is meant by clear and convincing evidence, *see* Williams v. Superintendent, Clifton T. Perkins Hospital Center, 43 Md. App. 588, 406 A.2d 1302 (1979).

*Motors, Inc.,* 254 Md. 501, 517, 255 A.2d 332, 340 (1969); *Bachrach v. Washington United Cooperative, Inc.,* 181 Md. 315, 321, 29 A.2d 822, 825 (1943); *Dixon v. Process Corp.,* 38 Md. App. 644, 656, 382 A.2d 893, 900, *cert. denied,* 282 Md. 731 (1978); *Loyola Federal Savings and Loan v. Trenchcraft, supra.*

Our review of the evidence convinces us that Judge Thieme did not err in finding that Butler had perpetrated a fraud on ALC. While the judge did not articulate that he was applying the "clear and convincing standard" *vis-a-vis* that of "preponderance of evidence" there was no requirement that he do so. "Judges," we said in *Hebb v. State,* 31 Md. App. 493, 499, 356 A.2d 583, 587-88 (1976), "are presumed to know the law. *Samson v. State,* 27 Md. App. 326, 334, 341 A.2d 817, 823 (1975). *See Schowgurow v. State,* 240 Md. 121, 126, 213 A.2d 475, 479 (1965). Absent an indication to the contrary, we must assume that judges apply the law correctly to the case before them." There is nothing within the record in the case *sub judice* that even remotely suggests that Judge Thieme applied an improper standard of proof to the evidence in this case.

We think that the evidence was clear and convincing that Butler perpetrated a fraud on ALC, *ergo,* Judge Thieme did not err in finding for ALC against Butler.

## — PUNITIVE DAMAGES *VEL NON* —

The Court of Appeals, in three relatively recent cases, *General Motors Corp. v. Piskor,* 281 Md. 627, 381 A.2d 16 (1977); *Wedeman v. City Chevrolet Co.,* 278 Md. 524, 366 A.2d 7 (1976); *H & R Block, Inc. v. Testerman,* 275 Md. 36, 338 A.2d 48 (1975), expounded in depth on the subject of awarding punitive damages in fraud cases. The Court emphatically stated that *when the tort of fraud arises out of a contractual relationship the party seeking recovery must establish actual malice in order to recover punitive damages.* Although punitive damages were allowed in *Wedeman,* the Court carefully noted that the fraud existent in that case "did not arise out of a contractual relationship, but instead induced appellant to enter into the contract...." *Wedeman v. City Chevrolet Co., supra* at 529-30, 366 A.2d at 11. In short, the

fraud in *Wedeman* preceded the contract and was the reason for the contract. The *Wedeman* Court declared that when the fraud does not arise out of a contract, the plaintiff does not have to prove actual malice but will establish his claim if he shows implied malice.

One of the conditions of the agreement between Butler and ALC was that the Viscount would be made "airworthy." The test flight demonstrated that it had not reached that point of repair. Nevertheless, without correcting the deficiencies disclosed by the test flight, Butler certified to the FAA that the aircraft was "airworthy" even though Butler knew or should have known that much remained to be done before the plane was "airworthy." The same representation was made to ALC. We think it too apparent for extended discussion that the fraud committed by Butler upon ALC did not precede the contract but arose directly out of it.

ALC, in this Court, attacks Judge Thieme's holding by bombarding us with various FAA Regulations. Simultaneously, they brush aside *Testerman, Wedeman* and *Piskor* in much the same fashion as an armada of Flying Fortresses did a trio of pesky Messerschmidts. They are recognized as a potential danger but ignored as a deterrent.

ALC endeavors to avoid the clear meaning of *Testerman-Wedeman-Piskor* by using the Federal Aviation Regulations (FAR) to demonstrate the breadth of Butler's fraud. Obviously, ALC wants to show that failure to comply with the FAR is equal to actual malice. Our reading of those regulations [14] fails to reveal that they are anything more or less than Federal Aviation directives relative to airworthiness, maintenance, the scope of the annual and 100-hour inspections and regulations concerned with "Repair Stations." [15] Violations of those regulations, however, do not lead to an inference that the violator is guilty of actual malice.

ALC supplements its argument with illustrations of the tragedy that *might* have befallen the Vickers on its flight to Miami. Moving one step past that point, ALC then suggests

---

14. Federal Aviation Regulations, 14 C.F.R. § 21 (1978).
15. Federal Aviation Regulations, 14 C.F.R. § 145 (1978).

that had the plane crashed enroute that Butler may have been criminally responsible. Be that as it may, the plane did not crash, and there was no tragedy. More than mental images of things that might have been are necessary to overcome *Testerman, Wedeman,* and *Piskor.* That trilogy stands as an insurmountable roadblock to recovery of punitive damages in fraud and deceit actions arising out of a contract, unless the party claiming that type of damage can show actual malice.

With respect to "actual malice," Judge Thieme said:

"The Court finds that no evidence of actual malice was presented. Nor was evidence presented from which the necessary malice could reasonably be inferred. In some situations, especially in the commercial sphere, direct evidence of actual malice is not required so long as the facts and circumstances surrounding the case permit the inference of actual malice. *Henderson v. Maryland National Bank,* 278 Md. 514, 520. In the instant case, sufficient evidence was presented to show that an unlawful act was committed intentionally and without legal justification. However, no evidence of a motive such as spite or hate is present and, more importantly, there is no showing of a motive to deliberately and willfully injure the Plaintiff. Neither is such a motive inferrible from these facts as it was in Henderson.

The Plaintiff has attempted to bring this case within the holding of *McClung-Logan v. Thomas,* 226 Md. 136, in which punitive damages were allowed for a tort of conversion. However, in *McClung-Logan,* actual malice in the form of irritation with the Plaintiff and an actual intent to harm him were inferrable from the factual situation. The evidence in the case and the inference which can reasonably be drawn from it lead to the conclusion that the fraudulent misrepresentation was the result of a desire to keep the cost of repair as low as possible even if it resulted in a breach. This was done in an attempt to stay within the fixed price of the

contract. In short, the motive was greed and a desire to maximize profit rather than to injure the Plaintiff. As reprehensible as such conduct may be, it does not conform to the definition of actual malice as set out by the appellate courts of this State. Whether the evidence is direct or indirect the motive must still be to injure the Plaintiff. The Court in *Knickerbocker Ice Co. v. Gardiner Co.,* 107 Md. 556 stated it thus in speaking of torts arising out of contracts:

> 'We do not mean to say there may not be such damages in cases of this character, for if, for example, there was evidence tending to show that the defendant had caused the contract to be broken for the sole purpose, and with the deliberate intention of wrongfully injuring the plaintiff, exemplary damages might be recovered, but when the object was merely to benefit itself, although the plaintiff would be thereby injured, there would be no more reason for allowing such damages than there would be in a suit by one party to a contract against the other for breach of it.' Id. at p. 569.

The Court does find that the evidence is sufficient to show the existence of implied malice, which *Testerman* describes as the wanton, reckless disregard of the rights of others. However, this proof of malice is insufficient to support an award of punitive damages where, as here, the tort arose out of a contractual relationship."

### III.

### — DAMAGES —

Appellant's final claim of error assaults the propriety of the compensatory damage award. The trial judge awarded ALC compensatory damages in the amount of $100 for Butler's breach and $17,120.62 for the fraud and deceit practiced by Butler.

## — BREACH OF CONTRACT —

ALC produced evidence at trial which led the court to conclude that Butler had indeed breached its repair contract. ALC disputes the mere pittance it has received in compensation for what it views as normally recoverable foreseeable damages arising from Butler's breach.

The contract provides, *inter alia,* a "Limitation of Liability" clause [16] which operates as an effective release of Butler's liability for breach of contract.

ALC contends, however, that it was error to have given effect to the exculpatory clause as applied to Butler's liability because, according to *Winterstein v. Wilcom,* 16 Md. App. 130, 136, 293 A.2d 821, 824-25, *cert. denied,* 266 Md. 744 (1972), "exculpatory agreements otherwise valid are not construed to cover the more extreme forms of negligence — willful, wanton, reckless or gross. Nor do they encompass only conduct which constitutes an intentional tort."

Judge Thieme reasoned that although exculpatory clauses may be voided on public interest grounds, *e.g.,* where "the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services . . .[,]" *Winterstein v. Wilcom, supra* at 137, 293 A.2d at 825, *quoting Tunkl v. Regents of the University of California,* 60 Cal. 2d 92, 383 P.2d 441 (1963), such was not the case before him. Our review of the evidence discloses that the trial judge relied on the fact that ALC had been

16. "Limitation of Liability:

(a) Customer agrees and hereby does release Butler from all liability for any or all loss or damage to Customer's property, excepting loss or damage caused by the negligence of Butler. . . .

(b) THE WARRANTY PROVIDED HEREIN, THE OBLIGATIONS AND LIABILITIES OF BUTLER HEREUNDER AND THE RIGHTS AND REMEDIES OF CUSTOMER HEREUNDER ARE IN LIEU OF AND CUSTOMER HEREBY WAIVES ALL OTHER WARRANTIES, GUARANTEES, OBLIGATIONS, LIABILITIES OR REMEDIES, EXPRESS OR IMPLIED ARISING BY LAW OR OTHERWISE (INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OF ANY OBLIGATION OR LIABILITY OF BUTLER ARISING FROM TORT OR WITH RESPECT TO LOSS OF USE, REVENUE OR PROFIT, OR CONSEQUENTIAL DAMAGE), AND SHALL NOT BE EXTENDED, ALTERED, VARIED OR AMENDED EXCEPT BY A WRITTEN INSTRUMENT SIGNED BY BUTLER AND CUSTOMER."

represented by counsel prior to the signing of the contract, thus indicating ALC was or should have been fully protected against the spectre of disparate and unfair bargaining strength. We perceive no error in Judge Thieme's conclusion inasmuch as there was abundant evidence from which he could find, as he did, that there was no violation of a public interest, and that the exculpatory clause barred the recovery of compensatory damages for breach of contract.

With respect to the breach of warranty claim, the trial court found that Butler had indeed breached the warranty provision embodied in the contract. That warranty was directed solely to faulty workmanship.[17] By its terms, the warranty limits recoverable damages to labor costs incurred in repairing the aircraft.[18] Noting that,

> "there is nothing in evidence from which the Court can arrive at a figure for the damages suffered by Aeropesca as a result of the breach [of warranty] . . . [,] nothing in evidence provides the Court with sufficient information to determine these costs. There is evidence of lost profit and other consequential damages resulting from Butler's failure to perform the contract, but, as noted above, these were effectively contracted away by the Plaintiff. [T]he Court has found a breach of the . . . [warranty] but has no evidence of the amount of damages. . . ."

Judge Thieme then entered a judgment for nominal damages

---

17. The warranty provided in pertinent part:

"(a) Butler warrants its overhaul and repair work to be free from defects due to its faulty workmanship.
(b) Faulty workmanship, as used herein, means failure on the part of Butler to conform to acceptable industry practice as prescribed by applicable governmental regulations, manufacturer's specification, and the herein agreement specifications.

18. With respect to damages the warranty states:

"(e) The obligation and liability of Butler under this warranty is *expressly limited to assuming only its labor cost of repairing or overhauling the aircraft or unit,* at its election, which it determines to be defective due to its faulty workmanship. . . ." (Emphasis supplied.)

in the amount of $100. His finding was not clearly erroneous and, hence, will remain undisturbed. Md. Rule 1086.

## — FRAUD AND DECEIT —

ALC maintains that the trial judge erred in his award of damages for fraud and deceit. ALC sought, *inter alia,* recovery for lost profits. The contemplated profits were based on contracts ALC had entered into for flights to be conducted in Colombia. Once the Vickers Viscount was grounded by Colombian authorities because of lack of airworthiness, ALC was unable to fulfill its commitments and, therefore, could not derive what it believed would have been profits.

Generally in cases sounding in tort, the tortfeasor is liable for any injury which is the direct, natural and probable consequence of his wrongdoing. *Adams v. Benson,* 208 Md. 261, 117 A.2d 881 (1955). Actions *ex delicto,* as well as *ex contractu* require that damages must be shown with some degree of specificity, not speculation. *Fred Frederick Motors, Inc. v. Krause,* 12 Md. App. 62, 277 A.2d 464 (1971).

The Court of Appeals has made pellucid that Maryland applies the "flexibility theory" in the recovery of damages for fraud and deceit. *Hinkle v. Rockville Motor Co.,* 262 Md. 502, 278 A.2d 42 (1971). *See also,* James and Gray, *Misrepresentation* (pt. 2), 37 Md. L. Rev. 488, 528 (1978). The flexibility theory takes its name from the four alternative methods available to an injured party in ascertaining damages arising from an action for fraud and deceit. The rules provides:

" '(1) If the defrauded party is content with the recovery of only the amount that he actually lost, his damages will be measured under that rule;

'(2) if the fraudulent representation also amounted to a warranty, recovery may be had for loss of the bargain because a fraud accompanied by a broken promise should cost the wrongdoer as much as the latter alone;

'(3) where the circumstances disclosed by the proof

are so vague as to cast virtually no light upon the value of the property had it conformed to the representations, the court will award damages equal only to the loss sustained; and

'(4) where * * * the damages under the benefit-of-the-bargain rule are proved with sufficient certainty, that rule will be employed.' "

*Hinkle v. Rockville, supra* at 511, 278 A.2d at 47, *quoting Selman v. Shirley,* 161 Or. 582, 609, 85 P.2d 384, 91 P.2d 312 (1938).

Judge Thieme held that ALC was entitled to recover damages for lost profits. He restricted his award, however, to the profits that would have been realized from a single contract entered into by ALC on August 29, 1974. That contract obligated ALC to provide air service in Colombia in exchange for certain monetary considerations. The trial judge opined that ALC

"certainly had the right to rely ... [on Butler's representation that the Vickers Viscount was repaired and 'airworthy']. The contract of August 29 was for eight special flights on the Bogota to Andres to Bogota route valued at 560,000 pesos and six flights from Pasto to Bogota valued at 540,000 pesos for a total of 1,100,000 pesos. This contract went unfulfilled to the damage of ... [ALC] and such damage is a direct result of reliance on the representation of ... [Butler]. There is sufficient evidence from which to find that ... [ALC] would not have entered into this contract but for the belief (based upon the fraudulent representation ... [by Butler] that the discrepancies noted on the test flight would be repaired and the aircraft ready for service when it left Baltimore for Colombia. The time for performance of ... [ALC'S Colombian] contract was September 14 to October 12, 1974. Using the peso/dollar conversion rate of 25.7 pesos per dollar for this period, the contract price is $42,801.55. Mr.

Luis Bonilla, President of Aeropesca, testified that the company made a 40% profit on each charter contract."

The trial court then allowed as damages, 40% of the $42,801.55 or $17,120.62.

ALC argues that the failure to make similar awards for the lost profits on two other airflight contracts was error. The trial judge rejected ALC's claim for damages on the two other contracts because they were entered into after it knew Butler's representations to be false.[19] Consequently, ALC's entering into those two contracts was not based on a *reasonable* reliance on Butler's representation. Additionally, Judge Thieme found that while there was evidence of ALC's prior profits, extrapolation to ascertain a dollar figure for the profits anticipated under those two contracts was not warranted. The evidence established that ALC's previous profits had been attained by employing two aircraft. The contracts in dispute called for the operation of only the Vickers involved in the matter *sub judice* and was not analogous. The judge believed the proof was so speculative as to preclude recovery.

The rule for the recovery of lost profits in Maryland has three prongs. Each must be met. The rule provides:

> "(1) a plaintiff must show that a breach by the defendant was the cause of the loss; (2) damages may not be awarded unless, when the contract was executed, the defendant could have reasonably foreseen that the loss of profits would be a probable result of a breach; and (3) lost profits may not be recovered unless they can be proved with 'reasonable certainty,' as distinguished from 'certainty.' "

*Impala Platinum Ltd. v. Impala Sales, Inc.,* 283 Md. 296, 330, 389 A.2d 887, 907 (1978). *Accord, Della Ratta, Inc. v.*

---

19. We refer to the representation made by Butler's agents on or about August 23, 1974, the day of the test flight, that the discrepancies revealed by the flight would be repaired before the Vickers' departure from Baltimore.

*American Better Community Developers, Inc.,* 38 Md. App. 119, 380 A.2d 627 (1977). *See also M & R Contractors & Builders v. Michael,* 215 Md. 340, 345-49, 138 A.2d 350, 353-55 (1958).

It was clear to the judge that ALC's prior experience in successfully operating its fleet of planes did not furnish an adequate basis for an estimation of lost profits when only one plane was used. There are simply too many intangibles involved. *See, e.g., Evergreen Amusement Corp. v. Milstead,* 206 Md. 610, 112 A.2d 901 (1955). We cannot say that Judge Thieme was clearly erroneous. Md. Rule 1086.

We have herein disposed of Butler's contentions by answering the jurisdictional question directly and the other two issues implicitly in our response to ALC's arguments.

*Judgments affirmed.*
*Costs to be divided equally between*
*the parties.*