MARGARET G. DITTO *v.* SHERMAN E. WOLF.

*Trespass—Location of Boundary Line—Evidence—Statement
by One Since Dead.*

On an issue as to the title to an alley, the striking out of testimony submitted by plaintiff as to the use of the alley by the public to reach defendant's store was not reversible error, in view of the lack of any offer to prove that such use of the alley was by defendant's invitation.                    p. 451

Trespass *quare clausum fregit* being a possessory action, in order to maintain it the plaintiff must show possession of the particular strip in controversy, or constructive possession thereof by reason of the actual possession of part of an entire tract described in a deed, of which it is claimed that the land in dispute forms part.                    p. 452

In an action of trespass *quare clausum fregit,* between owners of adjoining lots, involving the location of the line between such lots, *held* that there was evidence in favor of plaintiff's contention, including measurements from the possible outside

line of one of such lots to the outside line of the other, such as to justify a finding by the jury of title in plaintiff and invasion by defendant. pp. 452-456

A statement as to a boundary line, made by one since dead, when he had no motive to make a self-serving declaration, is admissible. p. 456

*Decided July 8th, 1927.*

Appeal from the Circuit Court for Washington County (WAGAMAN, J.).

Action by Margaret G. Ditto against Sherman E. Wolf. From a judgment for defendant, plaintiff appeals. Reversed.

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*Joseph W. Wolfinger,* with whom was *John E. Wagaman* on the brief, for the appellant.

*W. P. Wachter* and *J. Cleveland Grice,* for the appellee.

ADKINS, J., delivered the opinion of the Court.

This is an action of trespass *quare clausum fregit.* Margaret G. Ditto, appellant, was plaintiff, and Sherman E. Wolf, appellee, was defendant. They own adjoining lots on the northeast side of Main Street in the town of Boonsboro. The dispute is over a strip, spoken of as an alley, three or four feet wide to the north of appellant's dwelling. It appears to be enclosed with appellee's lot. At its entrance is a gate built by appellee. The fence was built in 1890 by Howard Flook, whose wife then owned the Wolf lot, there being no fence there when they bought it. Flook testified that when he built the fence he "intended to build it upon the line as called for by our deed."

No change was made in the location of the fence, as it was built by the Flooks, during their occupancy of the property.

Harry R. Gruber purchased from the Flooks in 1916. Mrs.
Gruber testified: "We lived there from 1914 to 1915; we
lived in it about two years before we bought it. I only saw
the property since by driving past. There was no change in
the fence during the time I lived there. The fence between
Mr. Welty's (now Ditto's) and our property ran from the
corner of Mr. Welty's house to the end of the yard, and then
a little off-set, run straight up to the stable, about two or two
and one-half feet, we never measured it. The fence looked
like it was in the same place as it was when I moved there.
I left the fence as I found it."

Carl Wilhide purchased from Gruber in 1919 and after-
wards sold to Sherman E. Wolf, the appellee, and his wife.
Wilhide testified: "During the time I occupied the Wolf
property, the fence became bad and Mr. Ditto and his son
rebuilt the fence. * * * We agreed for Mr. Ditto and his son
to rebuild the fence, which they did, and I paid my half.
I could not swear where they put it. The fence looked to me
like it was in the same place when I left as when I moved
there."

It is not sufficiently certain, therefore, from the evidence,
that the fence at the time of the trial was located where it
was built by Flook in 1890, to enable the court to say as a
matter of law that title to the strip in controversy had been
acquired by adverse possession, even if, under the facts of
this case, the possession of previous owners can be tacked to
that of appellee, which we do not decide.

There are two bills of exception. The first was to the
striking out of certain testimony as to the use of the alley
by the public. There was no reversible error in this ruling,
as there was no offer to prove that the use of the alley by the
public to get to appellee's store was by his invitation.

The second exception was to the granting of defendant's
first prayer, which instructed the jury "that under the plead-
ings in this case there is no evidence legally sufficient to en-
title the plaintiff to recover."

Strictly construed, the prayer is a variance prayer, and as
such it is too general, as it does not state the points wherein

it is claimed the variance exists. But, apart from the form, we find no variance. Trespass *quare clausum fregit* is a possessory action and it was necessary, in order to maintain it, for plaintiff to show possession by him of the particular strip in controversy, or constructive possession of it by reason of the actual possession of part of an entire tract described in a deed, of which it is claimed the land in dispute forms a part. 1 *Poe, Pl. & Pr.* (4th Ed.), sec. 245. We think there is evidence of such constructive possession.

The prayer, however, was probably intended as a demurrer to the evidence. Treating it as such, in our opinion there was error in granting it. We think there is evidence from which the jury could have found title in the plaintiff and invasion by the defendant.

In 1859 the said two adjoining lots together formed lot No. 40, which was owned by Tiras Welty and others, who, by their deed of April 4th, 1859, conveyed it to Lewis M. Johnson. In that deed the lot is described as being on the northeast side of Main Street, bounded on the north by the heirs of Peter Heck, deceased, on the south by the Reformed Church, on the east by a back alley, and on the west by Main Street, being known as lot No. 40, and fronting on Main Street 82½ feet and running back 264 feet to the alley in the rear.

Plaintiff offered the deed from Henry Heck and wife to Peter Heck, dated December 26th, 1840, and one from Henry Heck dated June 30th, 1838. The record shows that the Heck deed first mentioned conveyed the southern half of lot No. 41, which is 41 feet and 3 inches in width, and 264 feet in depth. While the record does not show it directly, it is clear, from references in deeds contained in the chains of titles to the two halves of lot No. 40, that the Catholic Church property referred to in said deeds is the southern part of lot No. 41.

Louis Johnson and wife, by deed dated March 23rd, 1882, conveyed to Theodore F. Welty, extending 41¼ feet on the northeast side of Main Street adjoining on the south the German Reformed Church property (subsequently the United

Brethren parsonage property), and by deed dated March 23rd, 1885, the said Louis Johnson conveyed to Annie E. Johnson the northern half of lot No. 40, 41¼ feet, adjoining on the north the Catholic Church and on the south the part of the lot he had conveyed to the said Theodore F. Welty.

The two parts of said lot No. 40 come down, respectively, by various mesne conveyances, the northern half to appellee and the southern half to appellant.

Samuel E. Schindel, a surveyor, testified that he was familiar with the property in controversy and knew the location of the Catholic Church property; that there is an iron fence in front of the church property, the southern end of which is right against the northern face of the Wolf residence; that the edge of the iron post is right up against, or possibly an inch away from, the north side of the Wolf house; that he measured from this post eastward (evidently meaning southeastward) along the line in front of the Wolf and Ditto lots to a point on the south side of the Ditto property where there is a stone in the ground, and also a division mark in the sidewalk, which is approximately 83 feet from the iron post at the church lot; that he first measured 41¼ feet from the iron post at the southern side of the church lot in a southerly direction, which led approximately to three feet north of the north walk of the Ditto house; that when he measured an additional 41¼ feet it went to a point about 5½ inches north of the centre of a stone inside of the retaining wall at the southern side of the Ditto lot, and about 7 or 8 inches from the division of the sidewalk; that the eastern (meaning southeastern) line of the store room on the Wolf property is about 4 feet 1 inch west (meaning northwest) of the Ditto house, leaving a space of about 4 feet 1 inch between the main wall of the Ditto house and the store; that, in measuring from the stone found at the south corner of the Ditto property 41¼ feet northwestwardly, you would reach a point about 2 feet 8 inches north (northwest) of the Ditto house; that measuring northwestwardly from the mark indicating the northwest extremity of the parsonage property a distance of 41¼ feet, one would reach a point

about 2 feet 6 inches north of the Ditto house; that witness has no means of identifying the corner of the Catholic Church property, but measured from the iron post where it stood to the United Brethren parsonage, that is, to the building, not taking the cornice into consideration; that the stone spoken of is in the Ditto yard between the Ditto house and the parsonage; that it is about 2 feet 2 inches from the center of this stone (which is about 4 inches square) to the parsonage; that the fence between the Ditto property and the parsonage extending from the northeast corner of the parsonage to the alley is a straight line; that measuring from the parsonage north (meaning northwest) 41 feet 3 inches one would reach 5½ inches north (northwest) of the Ditto house; witness does not know as a fact that the iron post is the starting point of the church property; when speaking of the line or fence on the western (meaning southwestern) boundary of the parsonage property, witness was giving the location of the fence as he saw it; that he does not know where the correct boundary between the Ditto property and the parsonage is.

Another witness, Harvey J. Huffer, testified that he is acquainted with the Wolf and Ditto and parsonage properties, having lived in Boonsboro and vicinity since 1870; that he has been a trustee of the parsonage for thirty-one years; that "I know where the line is between the United Brethren parsonage and the Ditto property on the north side of the parsonage property; I know it by a line stone in the curb of the pavement; the curb represents a succession of stones direct from the line inside the yard. I know that the stone was put in the yard about twenty-eight years ago; it stands in a line direct out across the curb. The stone was put there by Mr. Flook when he built the house; there was a fence along down there that came clear down to the street; the fence was torn away and he planted the stone there; the house that was built by Mr. Flook is now the United Brethren parsonage. I have known the Catholic Church as it exists there now since 1870, ever since I knew anything."

The above testimony of Huffer, unless it is neutralized as to the location of the stone to fix the northeast line of the

parsonage property by what he said on cross-examination, is evidence to go to the jury tending to show the northwest boundary line of the Wolf property and the southeast boundary of the Ditto property, and the surveyor's testimony shows the distance between these lines to be about 83 feet, about 6 inches more than the total number of front feet in both the Wolf and Ditto lots. And the distance of 41¼ feet northwesterly from the stone referred to would reach to a point about 2 feet 8 inches northwest of the Ditto house, which would tend to prove that about 2 feet 8 inches of the strip in dispute belonged to appellant.

On cross-examination Huffer said Fred Flook, the man he referred to, had been dead some years, that Howard Flook was living and sitting in the court room, and that he was a brother of Fred and helped him to build the house on the property then owned by Fred and later bought for the United Brethren parsonage. "I do not know of my own knowledge where this man built the United Brethren parsonage house with reference to a line, as I wasn't particularly interested, but I was in the house when he was building it several times. I do not know whether he was building on the corner of the lot or two feet into the line, or anything else, nor was I interested in the exact location that he put the house on the lot he owned, but he didn't build it on the edge of the line. I was not interested in planting any stone and did not see any stone planted. I never knew there was any stone there until recently. I know when the stone pavement was torn up about twenty-eight years ago at the time when he built his house. He built a fence from that house back to the alley with a draw from the fifth panel. It is not straight. That fence stands there today as it has stood there for twenty-eight years practically; I don't think it has been remodeled." On re-direct examination he said: "I know when a stone pavement was there and the Ditto pavement was a brick pavement; the stone pavement was torn up and this five-inch curb put down between the pavement out of stone with the dividing line of the pavement. This was twenty-eight years ago when the house was built."

The net result of his testimony seems to be that what he said about the stone in the yard may have been hearsay, possibly what Flook told him he intended to do to mark the line when he moved the fence. Such a statement about a boundary by one since dead, when apparently he had no motive for making a self-serving declaration, would be evidence. At any rate there remains intact the statement that the old division fence ran in a line with the stone; and there also remains the statement that the division line between the pavements of the two properties spoken of by the surveyor was made at the time the stone pavement in front of Flook's property was removed.

Howard Flook, who afterwards testified for the defendant, said he had no knowledge of the stone in the Ditto yard spoken of by Huffer; and his testimony indicates that he and witness and his brother were trying to locate the line when they built the house; but he is silent as to the division in the pavement.

A careful consideration of the testimony of Huffer and the surveyor, in connection with the exhibits, leads us to the conclusion that there was some evidence tending to prove the trespass, and that the case should have been submitted to the jury.

> *Judgment reversed, with costs to appellant,
> and new trial awarded.*