# BERNARD M. WEISS *v.* NORTHERN DREDGE & DOCK COMPANY.

[No. 14, April Term, 1928.]

352

*Decided May 24th, 1928.*

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*John H. Skeen* and *Philip C. Friese,* with whom were *Emory, Beeuwkes, Skeen & Oppenheimer* on the brief, for the appellant.

*Edward L. Ward,* for the appellee.

OFFUTT, J., delivered the opinion of the Court.

This is an appeal from a judgment of the Baltimore City Court on a directed verdict for the defendant in the short note case of a non-resident attachment proceeding instituted by Bernard M. Weiss against the Northern Dredge and Dock Company to recover compensation for services which he claimed to have rendered it, in connection with the sale of its dredge the "Patuxent".

The Northern Dredge and Dock Company, hereinafter referred to as the "Dock Company," was in 1925 and 1926 engaged in business as a dredging contractor, and in connection with that business it owned several dredges, one of which, the "Patuxent," located at Davis Island, Florida, it was willing to sell. Weiss, who appears to have been at that time engaged principally in selling marine and contractors' equipment on commission, on December 3d, 1925, telegraphed the Dock Company inquiring whether it had "any fifteen or eighteen inch hydraulic machines available for sale prices and delivery." When he made that inquiry Weiss appears to have had no definite purchaser in view, and it was but a step in a course or plan which he had adopted in connection with his business, which was to discover some person who had property for sale, to secure the privilege of selling it for a commission, and then to look for a purchaser.

At that time there appears to have been a very strong and widespread demand for Florida real estate, and land values there had risen to such a point that companies engaged in the development and sale of such property were having land, adantageously located, but which was not salable because of its low and swampy character, drained and filled in so as to adapt it to their uses. As a result of that situation dredges suitable for such work were much in demand, and, because

of that demand, Weiss appears to have thought that, if he could secure the privilege of selling the appelleee's dredge, he would be able to find a purchaser who would buy it at a price which would yield him a substantial profit. And so, when he was informed by the Dock Company, replying to his telegram, that it had an eighteen inch dredge which it would sell for $80,000, he at once asked for specifications. Answering that request the Dock Company on December 10th, 1925, sent him a telegram and a letter, setting out in detail the specifications of the dredge, telling him that it expected to be able to make delivery by January 1st, 1926, and quoting a price of $80,000 at Tampa. Upon receipt of those communications Weiss on December 17th telegraphed the Dock Company as follows:

"Your wire also letter tenth full particulars received. While deep draft steam operated hydraulics not in as great demand as twelve inch dissels I have two excellent buyers and believe can dispose of. I desire submit dredge with full particulars name specifications etc and assume price net to you seventy six thousand dollars. Will work on basis securing this figure net to you and any amount or overage above this price to myself and parties whom I am working with. Please advise if agreeable to you for me to work on this basis if you will protect me on whatever overage I quote with understanding that any buyers I bring to Tampa or may refer to you will either be quoted figure I name them or will be referred back to me. If this arrangement agreeable to you this places me in position give prospective purchasers all necessary information regarding machine where located for inspection and of course I will immediately notify you to whom I am quoting machine so that I can be protected. Believe can get results for you if secure your cooperation and might mention have already sold four machines in last five weeks wire answer."

And in reply to that telegram the Dock Company on December 18th telegraphed Weiss:

"Referring your wire seventeenth our price to you will be seventy six thousand dollars net if you quote much over eighty thousand on this outfit you are liable to kill your deal better keep price down and make a quick sale you can depend on us to cooperate with you any inquiries from your customers will be referred back to you."

After he had received that telegram, Weiss set actively to work to sell the dredge. He advertised it extensively, and personally and through his assistants attempted to interest various persons who might have use for it in its purchase, and he also engaged Harry P. Guion of Yonkers, New York, who was in the same business, to aid him in selling it. After he had arranged to assist Weiss, the Snell Island Company, Inc., which was engaged in land development in Florida, informed Guion that it wanted a dredge, and after some negotiations with other persons he told Weiss of the inquiry and asked him if he had an eighteen inch dredge for sale. Weiss replied that he had, the "Patuxent," and gave him a price of $100,000 to quote the Snell Island Company, and Guion, on December 24th, offered it to that company at that price. On the same day Weiss telegraphed the Dock Company that the Snell Island Company had wired for particulars concerning the dredge, and that William Smith, a "practical dredge man," would inspect it "for Snell," warning it to make no mention of price and telling it he was holding the dredge at $100,000. On December 26th the Dock Company wired Weiss:

"Letters and wires recd our Mr. Foley inspecting twenty inch dredge for Snell of Saint Petersburg have no offers out on dredge Patuxent except to yourself hope American British Improvement Company can make inspection at once as we expect to move plant to new location about Wednesday next sooner than expected and if sale is made would like to make it before going to moving expenses."

From then on until January 20th, 1926, Weiss reported to the Dock Company from time to time concerning various

persons to whom he was trying to sell the machine. But on the latter date the Dock Company wired him to call off any negotiations he might have for the sale of the Patuxent, because it was closing a deal to sell it. The "deal" to which the Dock Company referred was with the Snell Island Company, and subsequently it did sell the dredge to that ocmpany for a price which it said was less than $80,000, but the precise amount of which does not appear in the record.

After the sale had been made Weiss wrote the Dock Company, telling it that he had been "advised" that it had sold the dredge for $80,000, and further saying:

> "This transaction was covered in my wire to you of Dec. 24th and your reply of Dec. 26th. Of course, it is quite possible that you sold the machine for more than $80,000.00. I am inclined to believe that the dredge would have brought $90,000.00, but as it is your machine, quite naturally, you had the first say, and all I was trying to do was render service. I take it that you were fully convinced that this was the most you could secure from them.
>
> "I am enclosing herewith a bill for my commission in the amount of $4,000.00, and would request that check be forwarded to me as soon as the payment is made. I understand that the dredge is now on dry-dock and will not actually be turned over to Snell until some time next week. I had hoped to make out better than this on the transaction, for, as it now stands, my expenses were close to $1,000.00 and as I have to divide the remainder with my associate, Mr. Guion, it nets me only about $1,500.00."

To that letter Harry Merritt, for the Dock Company, replied:

> "Replying to your favor of the 26th inst., I regret the necessity of taking issue with you in the matter of your bill for $4,000.00, which you claim to be due you for an alleged commission on the sale of the 'Patuxent,' but the dredge was not sold by or through you, therefore, no commission is due you.

"The dredge was sold to Snell Isle, Incorporated, at considerably less than $80,000.00, the direct result of negotiations started by us long before we had had any correspondence about it with you."

Some time after that Weiss had an interview with Lucien Merritt, president of the Dock Company, at which he told Merritt that he would send him a bill for $4,000. Merritt told him that there was "no question in the world but what there was something coming to him," but, since all the negotiations were conducted on behalf of the company by Harry Merritt, he, Lucien Merritt, did not think it would be right to settle the claim unless Harry Merritt were present.

There was some further negotiation but nothing came of it, and on April 1st, 1926, Weiss instituted this proceeding, and the attachment was levied on certain property in the possession of Lancaster Iron Works, Incorporated. In due course the property attached was, upon the filing of a bond by the Lancaster Iron Works, Inc., discharged from the attachment, the Dock Company appeared and filed pleas to the short note, and that case proceeded to trial. At the trial, upon the conclusion of the plaintiff's case, the court directed a verdict for the defendant, and that ruling is the subject of the eighth and most important exception presented by the record.

Because the effect of the prayer involved in that exception was to concede the truth of such evidence as supports the plaintiff's claim, and as well all inferences of fact, which may fairly and legitimately be drawn from it, such facts as the plaintiff's evidence tends to prove have been stated in narrative form, although it seems hardly necessary to add that presumption does not extend beyond the consideration of that prayer.

The entire transaction between the Dock Company and Weiss in reference to the sale of the dredge was conducted by written and telegraphic correspondence, from which it may be inferred that Weiss' object was to sell the dredge for the highest possible price, so as to increase the "overage" which

he would receive as his commission, while the Dock Company was more interested in a speedy sale of the dredge than it was in Weiss' commissions. For while the Dock Company at the outset told Weiss that the selling price of the dredge was $80,000, and in its letter of December 18th strongly advised him to keep the price down, and warned him that if he quoted a price much over $80,000 he would "kill" the sale of it, Weiss, as soon as he was authorized to sell it, fixed the selling price at $90,000, which he increased to $100,000 as soon as the Snell Island Company indicated a willingness to consider its purchase.

There is nothing in the record to support the inference that the Dock Company had given Weiss the exclusive privilege of selling the dredge, so that it unquestionably had the right at any time to terminate its arrangement with him and sell the dredge directly, but the real question in the case is whether it could sell it to a purchaser procured by him at a lower price than he was authorized to sell it for, without first giving him a fair opportunity of selling it to such purchaser at a price which would yield him a profit, without becoming liable to compensate him for his services, and that question is presented by the appellee's granted prayer, which was in this form:

> "The Court instructs the jury that there is no evidence legally sufficient under the pleadings in this case to entitle the plaintiff to recover herein, as there is a variance between the contract specially declared on and the evidence offered in support thereof and therefore their verdict must be in favor of the defendant."

One theory of that prayer is that the pleadings committed the plaintiff to recovering on a specific contract, and that, since the evidence was not legally sufficient to permit him to recover on that specific contract, he was not entitled to recover at all. In other words, it was intended as a variance prayer, but as a variance prayer it was defective in form, because, while it relied upon a variance between the pleadings and the proof, it failed to indicate what the variance was. *Cali-*

*rider v. Weant,* 147 Md. 338; *Balto. & O. R. Co. v. Walsh,* 142 Md. 237; *Baltimore v. Terio,* 147 Md. 333; *Ditto v. Wolf,* 153 Md. 449; *Fidelity & Dep. Co. v. Beneficial Loan Assn.,* 153 Md. 188. And its effect, if it had any effect at all, was that of a general demurrer to the evidence. *Caltrider v. Weant, supra; Ditto v. Wolf, supra; Fidelity & Deposit Co. v. Beneficial Loan Assn., supra.* Considered as a general demurrer to the evidence, the only question which it presented was whether, upon all the evidence in the case, the plaintiff was entitled to recover in any form of action without reference to the pleadings in the case (*Balto. & O. R. Co. v. Walsh, supra*), notwithstanding the nature of the proceeding, for when the defendant in an attachment proceeding appears and pleads to the short note, the action proceeds in the same manner as the ordinary action in assumpsit at common law. 2 *Poe, Pl. & Pr.,* sec. 560.

In dealing with the main question, it may be assumed that there was an express contract between the parties, since both sides admit that, and there is no dispute as to its terms, for they were definitely fixed by the written and telegraphic correspondence between them. Briefly stated, the contract was in substance this: Weiss offered to sell appellee's dredge at a price net to it of $76,000, and to accept as compensation for that service such sum over and above $76,000 as he could secure from the sale, and that offer was upon the condition that the appellee would protect him on "whatever overage" he might quote, and that it would quote to any buyer referred to it by him the selling price named to such buyer by him. Replying to that offer, the appellee said: "Our price to you will be $76,000 net if you quote much over $80,000 on this outfit you will kill your deal * * * You can depend on us to co-operate with you. Any inquiries from your customers will be referred back to you." Whilst that was not in terms a direct and categorical acceptance, yet, taken in connection with the conduct and other correspondence of the parties, it permits the inference that it was intended as an expression of appellee's assent to appellant's offer, and that appellee intended appellant to so believe.

The contract was never performed (1) because the actual sale of the property was negotiated by the Dock Company, and not by Weiss, and (2) because the evidence, so far as it shows anything, shows that it was sold for less than $76,000. And because it never was performed, appellee contends that appellant is not entitled to recover, either upon it or in general assumpsit as upon a *quantum meruit.*

It is undoubtedly true that, where all the evidence shows that a plaintiff's claim is based upon a special or express contract which the defendant has performed, but which the plaintiff has not performed, he cannot recover for partial performance or at all. *Oldewurtel v. Bevan,* 117 Md. 652; 2 *Poe, Pl. & Pr.,* sec. 102. But that rule is subject to the qualification that where the plaintiff's failure to perform was occasioned by some default, neglect, or wrongful act of the defendant, "he may recover in general assumpsit for the work actually done, and the defendant cannot set up the special contract to defeat him." *Lustbader v. Ulman,* 139 Md. 654; *Balto. & O. R. Co. v. Carter,* 133 Md. 556; *Boyd v. Johnson,* 145 Md. 389 *et seq.* For if the defendant accepts benefits accruing to him from plaintiff's services, he ought not to be permitted to escape what would seem to be his duty of reasonably compensating plaintiff for such services, by preventing him from completing his contract. So that the question comes finally to this, Is there in the case any evidence legally sufficient to show that the failure of the plaintiff to complete his contract was occasioned by any default or wrongful act of the defendant?

In a contract such as that sued on in this case, the broker takes certain risks, as, for instance, that the owner may terminate the contract at will, or that the property may be sold by the owner or some other broker before he effects a sale, or that he may not find a purchaser willing to pay a price which will yield him a profit, but he does not take nor ought he be required to take the risk of having the owner repudiate the contract and sell the property to a buyer introduced by the broker, without giving the broker a reasonable oppor-

tunity of completing his contract by selling the property to the buyer at a price which would yield him a profit.

Under the contract sued on appellee definitely promised (1) that it would "co-operate with" the plaintiff, and (2) that it would refer back to him all inquiries from his customers, and it knew from the correspondence between them that it had led the broker to believe that it would quote to customers procured by him a price which he named. But it may be fairly inferred from the evidence that it did negotiate directly with the Snell Island Company, which bought the dredge after Guion and Weiss had interested that company in it, and after Weiss had informed appellee that the Snell Island Company was interested in it, and after he had also informed it of the price he had quoted to that ompany. And it may also be inferred that not only did appellee fail to quote to the buyer the selling price named by Weiss, or refer its inquiries to him, but that it even withheld from him the fact that it was negotiating with the Snell Island Company. That is to say, there is evidence in the case that Weiss and his associate interested the Snell Island Company in the dredge, quoted it a price of $100,000 on it, that Weiss immediately informed his principal of what he had done, and gave it the name of his customer, and that it, then, without consulting Weiss or letting him know what it was doing, sold the dredge to the buyer he had produced at a price less than that which it had authorized him to sell it for.

While such conduct unexplained certainly constituted a breach of its contract with Weiss, appellee attempted to escape the natural consequences of its action upon several grounds. First, it said that the Snell Island Company was its customer, and not the customer of Weiss, but there is evidence to the contrary. Indeed, the only evidence tending to show that such was the fact is a self-serving declaration in a letter from appellee to appellant, written after the sale, in which it stated that the sale was the result of "negotiations started by us long before we had any correspondence with you." But the court was not at liberty to accept that statement as conclusive of the question, in view of the fact

that, after Weiss had informed the appellee that the Snell Island Company was interested in the dredge, it telegraphed him that it "had no offers out on dredge Patuxent except to yourself," and still later telegraphed him: "Did you get any of your prospects interested" in the dredge, and of the further fact that it may be inferred from Guion's testimony that the Snell Island Company knew nothing of the dredge until it learned of it through him.

Again, appellee contends that the price named by Weiss was so high that the appellee as a cautious business man was justified in putting an end to the contract, and under other conditions there would be a great deal of force in that objection. For the figure quoted by Weiss may have justified the inference that his efforts and his zeal were directed to securing a large commission for himself rather than to effecting a quick sale at a lower price, and appellee may well have felt that its interests were jeopardized by what it may justly have considered the selfish greed of its broker, and it would have been entirely justified in terminating the contract on that ground. But it did nothing of the kind, but on the contrary, although it warned Weiss in the beginning not to quote too high a price, it fixed no upward limit on the price Weiss was authorized to ask for it, and, although it was told on December 24th, 1925, that he had named a price to the Snell Island Company of $100,000, it neither objected nor protested, nor did it then terminate the contract, but two days later reiterated its previous statement that its price "to him" was $76,000. Another objection is that Weiss was too slow in making a sale. But there was no time limit in the contract, and, until terminated by the appellee, appellant would have been entitled to a reasonable time within which to perform it.

But while there was evidence to support a finding that appellee violated its contract with the appellant, manifestly he could not recover substantial damages for that breach, because there is no possible measure of damages, but he may recover on the common counts for the reasonable value of the services which he rendered under it, and the contract may

be offered in evidence in support of his claim. For while it does not appear that he could have sold the property to the buyer at a price which would have yielded a profit to him, he was entitled to have a reasonable opportunity to make the effort, and, when the owner refused in violation of the contract to afford him such an opportunity, but took the benefit of his services and abandoned the contract, it became bound to pay appellee what his services were reasonably worth. In speaking of such a situation, the court, in *Burdett v. Parish,* 185 Mo. App. 613, said: "In such contracts the broker agrees, in substance, that in consideration of the opportunity of employing his talents to procure for himself a larger commission than he would be entitled to receive under ordinary employment, he will run the risk of procuring a buyer who will pay no more than the fixed price, and thus deprive himself of any reward. *La Force v. University* (106 Mo. App. 517), *supra.* But in none of the reported cases is the right of the principal to sell at the fixed price to a buyer introduced by the agent recognized as unqualified. The principal must act in good faith toward his agent, and is not allowed, while the agent's authority stands unrevoked, and he is laboring in good faith to make a sale at a price that will give him a commission, to fraudulently or improperly interfere with the agent by selling to the buyer procured by the agent at the fixed net price."

In our opinion therefore appellee's prayer should have been refused.

In addition to this exception, the record presents seven others, all of which involve rulings on evidence. Of these the third, fourth, sixth, and seventh relate to rulings which were not pressed in this court and could not possibly have injured appellant, and need not be discussed.

Weiss, testifying in his own behalf, was shown an advertisement in a newspaper, and asked if he had had it inserted. The witness was entitled to show what he had done in his effort to sell the dredge, and, if he had advertised it, technically he had the right to offer in evidence papers containing such advertisements, to corroborate his

statement, but, assuming that the examiner intended to bring out that fact, he was not injured by the refusal of the court to allow the question which is the subject of the first exception, because he was later permitted to testify to the places in which he had advertised the property, and to describe in detail the steps he took to sell it. The second exception was to the refusal of the court to allow the plaintiff to prove the customary commissions payable for the sale of such property. There was no error in that ruling, for while the measure of the damages which the appellant was entitled to recover was the value of his services at the time and place where they were rendered, and as reflecting upon that issue he was entitled to show what was usually paid for like services at that place and time, the question under consideration was too general, and did not confine the witness within those limits. Moreover it assumed a fact which had not been proved, that there was a "customary rate of commission."

William H. Smith, a witness for the appellant, having testified that he had inspected the dredge for the Snell Island Company, was asked "what were the market conditions at that time and place as far as dredges were concerned?" An objection to that question was sustained, and that ruling is the subject of the fifth exception. The inquiry had some bearing upon the probability of appellant's ability to sell the dredge if given a reasonable opportunity and, while it failed to indicate whether by market conditions it referred to demand or to prices, both inquiries were material and it should have been allowed, though we do not regard the error as reversible. But for the error indicated in the eighth exception it will be necessary to reverse the judgment appealed from and remand the case for a new trial.

*Judgment reversed and case remanded for a new trial, with costs to the appellant.*