NATIONAL MICROGRAPHICS SYSTEMS, INC. *v.*
OCE-INDUSTRIES, INC.

[No. 1275, September Term, 1982.]

*Decided September 8, 1983.*

The cause was argued before MOYLAN, WEANT and BISHOP, JJ.

*Dov Apfel,* with whom were *Hoffman & Apfel, P.C., Stuart S. Greenfeig* and *Goldman, Walker, Greenfeig & Metro, Chartered* on the brief, for appellant.

*Elliott B. Adler,* with whom were *John P. Wintrol* and *Perito, Duerk, Carlson & Pinco, P.C.* on the brief, for appellee.

BISHOP, J., delivered the opinion of the Court.

National Micrographics Systems, Incorporated (NMS), appeals several rulings entered by the Circuit Court for Montgomery County in favor of the appellee, OCE-Industries, Incorporated (OCE). The trial court ruled, *inter alia,* that OCE could recover payment due for goods sold and delivered to NMS; it also upheld jury findings that OCE breached oral and written contracts with NMS, but ruled that NMS could not recover compensatory or punitive damages. NMS urges that the trial court erred by ruling in favor of OCE's claim, by preventing NMS from recovering the aforementioned damages, and by failing to award NMS the full cost of depositions it introduced into evidence.

## The Facts

OCE is a Chicago based firm that produces micrographic equipment, parts, and supplies. It sells these goods to customers directly, through branch offices, and also through authorized dealers throughout the country.

NMS is an independent retail dealer that represents various suppliers in the sale of micrographic products and other office equipment in the Baltimore-Washington area. NMS was a distributor for ten to fifteen competitors of OCE.

During the first or second quarter of 1974 OCE orally agreed that NMS would sell its products in the Baltimore metropolitan area and the District of Columbia. The parties

operated under the oral agreement until September 1976, when they entered into a written dealership agreement.

NMS claimed that OCE promised not to compete with NMS's marketing of OCE micrographic products in the Baltimore-Washington area during the term of the oral agreement. This promise allegedly was made by OCE's branch manager during the fourth quarter of 1974. NMS contends that it was mainly in consideration of the promise not to compete that it agreed to enter into the written dealership agreement. This written agreement was to continue from year to year with termination upon two months' notice by either party. NMS knew that current government contracts listed both NMS and OCE as authorized agents for the sale and service of OCE equipment.

In December 1977 or January 1978, NMS discovered that OCE had been selling products authorized to be sold by NMS to customers located in the Baltimore-Washington territory. NMS told OCE that these sales violated its agreement not to compete, and demanded an explanation. On February 2, 1978, before the matter was resolved, OCE gave NMS notice of its intent to terminate the agreement under the two month termination provision; as a result, in April 1978, the contract terminated. NMS refused to make any payment on its outstanding account to OCE for the goods delivered and sold on behalf of OCE before the termination of the contract.

OCE initiated an action on September 28, 1978, against NMS for money due on account for goods it had sold and delivered to NMS from July 1977 through June 1978.

In response, NMS filed a counterclaim on May 14, 1979, alleging in three counts:

Count 1, breach of agreement not to compete with NMS during the term of the *written* contract;

Count 2, unfair competition;

Count 3, wrongful interference with contractual relations.

On December 16, 1980, NMS alleged in three additional counts in its amended counterclaim:

Count 4, breach of agreement not to compete with NMS during the term of the *oral* contract;

Count 5, fraudulent inducement to enter into the written contract by a promise not to compete;

Count 6, tortious interference with prospective economic advantage.

As a result of OCE's conduct, NMS claimed a loss of profit and claimed actual damages for each count. It also claimed punitive damages for Counts 2 (unfair competition), 3 (wrongful interference), 5 (fraud) and 6 (tortious interference).

The court sustained OCE's demurrer to counterclaim 2 (unfair competition) and granted OCE's motion for summary judgment on counterclaim 3 (wrongful interference with contractual relations) and 6 (tortious interference with prospective economic advantage). NMS has not appealed these rulings.

NMS is appealing the court's treatment of counterclaims 1 and 4 (breach of contracts not to compete) and 5 (fraud).

On April 30, 1981, before trial, the circuit court granted partial summary judgment on Count 5, holding that NMS was not entitled to recover punitive damages on its fraud claim. After the parties presented their evidence, the trial court reaffirmed its summary judgment; it also held that OCE was entitled to a directed verdict preventing NMS from recovering compensatory damages for fraud.

NMS had earned a commission from OCE for each of its sales of OCE equipment and reorders of OCE supplies. The commission was equal to the difference between the sale price and the dealer cost for each item. In order to establish its damages, NMS introduced a 66 page summary listing all of OCE's direct sales of micrographic equipment in the Baltimore-Washington region during the terms of both the oral and written agreements, for which NMS received no commission. NMS argued in the lower court and argues here that OCE's breach of its agreement not to compete caused NMS to suffer damages equal to the lost commissions and

fees on all of these sales. NMS did not have any past commercial relationship with a number of the customers listed in the 66 page summary to whom OCE sold equipment.

The lower court limited the jury's consideration of damages to lost commissions on sales to customers with whom NMS had previous commercial relations, rather than on all micrographic equipment sales made by OCE in NMS's market area.

The case was then submitted to the jury. On May 20, 1981, it returned a special verdict in favor of NMS on the counterclaims of fraud (5), for which NMS received no compensatory or punitive damages, breach of oral contract (4), for which the jury awarded NMS $4,911.90; and breach of written contract (1), for which the jury awarded NMS $19,845.11.

On July 8, 1981, the trial court treated OCE's previous motion for a directed verdict as a motion for judgment notwithstanding the verdict. The trial court upheld the jury's findings that OCE had breached its contracts. Because it believed that NMS had not shown sufficient evidence of lost profits, however, the court granted OCE's motion for judgment notwithstanding the verdict as to the jury's damage awards for counterclaims 1 and 4 (breach of the written and oral contracts, respectively). Each party was held responsible for its respective costs. On November 24, 1981, the trial court entered a judgment against appellant NMS's counterclaims and in favor of appellee OCE's claims, ordering NMS to pay $22,535.64 for products delivered under the written dealership agreement of September 1, 1976.

On appeal, NMS asks us to review five of the lower court's rulings:

(I) The ruling that the jury, in calculating NMS's damages, could only consider OCE's sales to customers with whom NMS had had a commercial relationship.

(II) The judgment n.o.v., which prevented NMS from recovering any of the commissions it claimed from the OCE sales.

(III) The ruling that there was insufficient evidence to support NMS's claim for punitive damages under its fraud count.

(IV) The ruling that OCE was entitled to recover on its declaration.

(V) The refusal to award NMS the total cost of depositions it introduced into evidence.

## I. and II.

### DAMAGES FOR BREACH

NMS argues that the innocent party in a breach of contract case is entitled to receive damages that would place him in the same position in which he would have been had the contract not been breached. *Dialist Co. v. Pulford,* 42 Md. App. 173, 179 (1979). In this case the amount of damages to bring this about is the profit that would have been realized had no breach occurred. NMS and OCE agree that under Maryland law the innocent party seeking to recover lost profits must prove (1) that the breach was the cause of the loss, (2) that the defendant could have foreseen when the contract was executed that a loss of profits would be a probable result of a breach, and (3) the amount of lost profits with reasonable certainty. *Aeropesca Limited v. Butler Aviation International, Inc.,* 44 Md. App. 610, 632 (1980); *John D. Copanos & Sons, Inc. v. McDade Rigging & Steel Erection Co., Inc.,* 43 Md. App. 204, 206 (1979). NMS argues that the 66 page summary showing OCE's actual sales in the NMS territory was the best available evidence to assist the jury in reasonably ascertaining the amount of the damages. The trial court, however, found that NMS had no commercial relationship with many of the listed customers. It stated, "the court finds that any loss of commissions do not flow directly from the breach of the agreement, because there is no evidence to establish had OCE not been in the area, NMS would have either contacted them, sold them, or indeed in any way received those commissions". Consequently, it partially granted OCE's motion for directed verdict, ruling that

the jury, when assessing damages, could only consider OCE's sales to the government and to prior NMS customers.

The jury, however, found in its special verdict that during the period of the *oral* contract, 1974-1976, OCE had agreed not to sell the same products as NMS to *any* customers in the Baltimore-Washington territory. The jury found that during the period of the *written* contract, 1976-1978, OCE had agreed not to contact NMS's prior customers to sell the same products. This is clear when we consider the jury's answers to questions I. 1) and 4) and II. 2) & 3):

"I. Relationship between OCE and NMS from March 1974 to September 1976. (The oral contract).

1) Did OCE through Mr. Pratt tell NMS that OCE would not sell the same products as NMS in the Baltimore-Washington area?
Yes __√__ No. _____

2) Did OCE agree to pay commissions to NMS on all sales made by OCE in the Baltimore-Washington area?
Yes _____ No. __√__

3) Was there a meeting of the minds between OCE and NMS on the oral contract?
Yes __√__ No. _____

4) Did OCE agree not to 'Compete' with NMS in the Baltimore-Washington area?
Yes __√__ No. _____

If Yes, what is meaning of *Compete?*

1. OCE would not sell in the area __√__ or

2. OCE would not contact the same customers as NMS _____

5) Did OCE breach an oral contract between 1974 and 1976?
Yes __√__ No. _____

6) NMS knew or should have known before 1976 that OCE was selling the same products in the same area.

Yes _____ No. \_\_✓\_\_\_

II. Agreement of September 1, 1976. (The written contract)

1) Was there a meeting of the minds as to the meaning of the Dealership Agreement?

Yes \_\_✓\_\_\_ No. _____

2) Did OCE agree not to sell any of the same products as NMS in the Baltimore-Washington area?

Yes _____ No. \_\_✓\_\_\_

3) Did OCE agree not to contact the same customers for the same products sold by NMS in the Baltimore-Washington area?

Yes \_\_✓\_\_\_ No. _____

4) Did OCE breach the written contract?

Yes \_\_✓\_\_\_ No. _____

Fraud _____ For (NMS) or OCE

If you find for NMS, in what amount:

For oral agreement $4,911.90

For written agreement $19,845.11"

The jury clearly found that OCE breached its agreement (1) not to sell to any customer in the territory during the oral contract, and (2) not to contact NMS customers during the written contract.

Nonetheless, the trial court, in its opinion and order of July 8, 1981, found that "NMS was unaware of any of the sales of OCE until after suit was filed. NMS did not introduce evidence of *one* sale that was made to the same department or agency that NMS was dealing with. Not one customer was brought in to say they would have bought anything from NMS if OCE had not sold them the order. There is not one iota of evidence that NMS would have called upon the same purchasing agent to sell the product if OCE had not done so." Accordingly, the court entered judgment n.o.v. against NMS's counterclaim for breach of oral and written contracts.

NMS contends that the lower court erred by substituting its judgment for that of the jury. We agree. In *Rowe v. Baltimore Colts,* 53 Md.App. 526, 532 (1983), we said:

> "A directed verdict is never appropriate when there is any legally sufficient and relevant evidence, however slight, from which a rational mind can infer a fact, which if found to exist would preclude entry of judgment for the movant. In considering whether to grant a directed verdict, the trial judge is required to view all admitted evidence and inferences rationally deducible therefrom in the light most favorable to the party against whom the motion is made. 'Maryland', as the Court of Appeals has had the opportunity to observe in *Fowler v. Smith,* 240 Md. at 246 . . ., 'has gone almost as far as any [other] jurisdiction that we know of in holding that meager evidence is sufficient to carry the case to the jury.' Unless the facts and circumstances permit the drawing of but one inference in regard to the issues, a directed verdict should not be granted." (Citations omitted.)

Similarly, in *Impala Platinum v. Impala Sales,* 283 Md. 296, 327 (1978), the Court of Appeals held:

> "The general rule by which the sufficiency of the evidence is to be tested on appellate review is the same for a judgment n.o.v. and a directed verdict. The evidence and the reasonable inferences to be drawn from it are to be considered in the light most favorable to the party opposing the motion. A party is not entitled to judgment n.o.v. unless the facts and circumstances so considered are such as to permit of only one inference with regard to the issue presented." (Citations omitted.)

Applying these standards, the issue is whether the trial court erred in ruling that there was insufficient evidence of lost profits to permit the jury to calculate NMS's damages

with reasonable certainty. In *M & R Contractors & Builders, Inc. v. Michael,* 215 Md. 340, 349 (1958) Judge Horney referred to "Speculative Profits as Damages for Breach of Contract," 46 Harv. L.Rev. 696 (1933), which stated that "the last hundred years have witnessed continual modification of the once rigid rule that anticipated profits, because inherently uncertain, were *per se* not a proper element of damages for breach of contract." The Court noted that:

> "Some of the modifications aimed at avoiding the harsh requirements of the 'certainty' rule include:
>
> (a) if the fact of damage is proven with certainty, the extent or the amount thereof may be left to reasonable inference; (b) where a defendant's wrong has caused the difficulty of proving damage, he cannot complain of the resulting uncertainty; (c) mere difficulty in ascertaining the amount of damage is not fatal; (d) mathematical precision in fixing the exact amount is not required; (e) it is sufficient if the best evidence of the damage which is available is produced; and (f) the plaintiff is entitled to recover the value of his contract as measured by the value of his profits. McCormick, *Damages,* Sec. 27 (1935)."

*Id. Accord Macke Co. v. Pizza of Gaithersburg,* 259 Md. 479, 488-89 (1970); *Della Ratta, Inc. v. American Better Community Developers, Inc.,* 38 Md. App. 119, 139 (1977).

There was sufficient evidence from which a rational mind could conclude that NMS could have made the sales and supplied the same products supplied by OCE at the same price. OCE sold its products directly to its customers at the same price that NMS sold the same products. NMS was OCE's only sales agent in the area, at least during the term of the oral agreement. The oral agreement, running from October 1974 to September 1976, gave NMS rights to its territory exclusive of OCE competition; the written agreement, running from September 1976 to April 1978, gave NMS exclusive rights to certain customers. The fact

that the customers did buy OCE micrographic equipment permits a reasonable inference that NMS could have sold the equipment, had it solicited the same customers.

In a case where the principal has wrongfully terminated a sales agent's contract and made sales directly to customers, it is permissible to use the principal's sales to estimate the agent's lost profits. In *John B. Robeson Associates, Inc. v. Gardens of Faith, Inc.,* 226 Md. 215 (1961), a commercial sales organization brought suit against the cemetery company for which it had agreed under a three year contract to sell cemetery lots and bronze memorials. The Court approved damages, including a percentage of the sales made for one year *after* the contract had been wrongfully terminated. The Court held that:

> "The recovery of damages of the nature here claimed by the appellant depends upon the extent that the evidence affords a sufficient basis for estimating their amount in money with reasonable certainty. Professor Corbin, 5 Corbin, *Contracts,* §1025, points out that, in cases such as the instant one, proof of the sales made and business done in the agreed territory before the breach, *or of the sales made by the principal or his agent after the breach,* may be such as to 'make possible a reasonably accurate estimate of the commissions that the agent has been prevented from earning." *Id.* at 225-26 (Emphasis added.)

In *Robeson,* the principal totally precluded the agent's sales during the last year of their contract; in this case, OCE sold its products concurrently, without NMS's knowledge. OCE seizes upon this distinction, contending there is no proof that NMS *would* have sold to OCE's customers, had OCE not done so. *See Universal Lite Distributors, Inc. v. Northwest Industries, Inc.* 602 F.2d 1173 (4th Cir. 1979).

We hold, however, that NMS did not have this burden of proof. As the jury found in its special verdict, OCE orally agreed not to sell any of its products that NMS was autho-

rized to sell in its designated market area. It later agreed in writing not to contact any of NMS's customers to sell the same micrographic products. OCE had no authority to make sales to these customers, except through NMS. Its failure to make these referrals prevented NMS from making the sales.

The law seeks to encourage reliable contracting by giving the non-breaching party the benefit of the bargain — placing it in the position it would have occupied had no breach occurred. The law also seeks to discourage breach of contract by seeing to it that a party does not benefit from its breach. In this case, NMS bargained for the right to occupy the field in a particular market. A jury could find that, had OCE complied with the contracts by referring customers, NMS would have made the sales, thus reaping the benefit of its bargain. Because OCE sold directly to customers that it should have referred, it is estopped by its wrongful conduct to deny that NMS would have made the sales. *See Sparks v. Reliable Dayton Motor Car Co.,* 85 Kan. 29, 116 P. 363 (1911). *Sparks* cited with approval *Schiffman v. Peerless Motor Car Co.,* 13 Cal. App. 600, 110 P. 460 (1910), which held that it is no defense to say that the plaintiff, who had an exclusive territory under the contract, would not have made the sales:

> "The profits which plaintiff here complains that he was deprived of are those which he would have made from the sale of these machines had the defendant either refused to invade the exclusive territory granted to him, or have referred the inquiries of the purchasers to him, as it agreed to do in the contract. There is nothing speculative or uncertain as to the amount of profits of which plaintiff was thus deprived, and their loss is so closely connected with the breach of the obligation by the defendant that it is difficult to see any ground upon which it can be said that plaintiff's injury is too remote either in nature or origin." 110 P. at 462.

We do not find *Universal Lite Distributors, Inc. v. Northwest Industries, Inc.,* 602 F.2d 1173 (4th Cir. 1979) cited by OCE and the lower court, to be persuasive. The Fourth Circuit's brief *per curiam* opinion found that an exclusive distributor did not prove with reasonable certainty that it would have made sales diverted by its supplier. That opinion, however, did not consider the sort of principles set forth in this opinion; the only authority cited in support of its conclusion was *Macke Co. v. Pizza of Gaithersburg, Inc., supra,* which required that lost profits be shown with reasonable certainty. After describing the certainty requirement, though, *Macke* agrees with *Robeson* that "the use of a defendant's future earnings [is] an appropriate method of determining lost profits. . . ." 259 Md. at 492. Thus, neither the reasoning nor the authority cited in Universal Lite persuades us to deny NMS the profits diverted by OCE.

NMS is entitled to a jury verdict for lost profits. The damage assessment should be based on all OCE sales listed in the 66 page summary, except those made during the written contract to businesses that were not prior customers of NMS.

## III.

### *PUNITIVE DAMAGES FOR FRAUD*

In its fifth counterclaim, NMS alleged that OCE fraudulently induced it to enter into the written contract by promising not to compete, intending all the while to continue its competition with NMS. The jury found that OCE had indeed committed fraud. The trial court, however, had granted summary judgment against NMS's claim for punitive damages on the ground that NMS had not shown that OCE acted with actual malice.

Proof of malice is a prerequisite to recovery of punitive damages for fraud. *See generally American Laundry Machinery Industries v. Horan,* 45 Md. App. 97 (1980). Where the fraud arises out of a contractual relationship, the claimant must show that the defrauding party acted with

actual malice — generally defined as ill will. *See H & R Block, Inc. v. Testerman,* 275 Md. 36 (1975). Where the fraud induces the contractual relationship, the claimant need only prove implied malice — generally defined as reckless disregard for another's interests. *See Wedeman v. City Chevrolet Co.,* 278 Md. 524 (1976).

NMS raises two questions: (a) whether OCE's fraud arose out of a contractual relationship, necessitating proof of actual malice; and (b) whether it was proper for the lower court to take the issue from the jury by use of summary judgment.

### a.

### *Malice*

The lower court found that, "OCE and NMS were operating under a contractual relationship for the two years prior to the execution of the written contract. Consequently, the alleged fraud arises out of the contractual relationship and requires a showing of actual malice rather than implied malice. *H & R Block, Inc. v. Testerman,* and *Aeropesca Ltd. v. Butler Aviation,* 44 Md. App. 610 [(1980)]."

In *Testerman,* H & R Block hired employees who lacked the training, experience and competence to assist two customers in properly preparing their business tax returns. The Court held that because Block's preparation of inaccurate returns arose out of a contractual relationship, in order to collect punitive damages the taxpayers were required to show Block acted with actual malice:

> "Although the doctrine of punitive damages has been associated traditionally with the field of torts, the award of such damages has been sought not infrequently in contract-related cases. While it is well settled in this state that punitive damages cannot be awarded in a pure action for breach of contract, *Siegman v. Equitable Trust Co., supra,* 267, Md. at 313; *St. Paul at Chase v. Mfrs. Life*

*Insur., supra,* 262 Md. at 236, such damages are recoverable in tort actions arising out of contractual relationships. In such situations, however, actual malice has been required. In *Knickerbocker Co. v. Gardiner Co.,* 107 Md. 556, 569-70, 69 A. 405 (1908), the landmark Maryland case in this area, the Court stated:

'. . . We do not mean to say there may not be [punitive] damages in cases of this character, for if, for example, there was evidence tending to show that the defendant had caused the contract to be broken for the *sole purpose, and with the deliberate intention of wrongfully injuring* the plaintiff, exemplary damages might be recovered, but when the object was merely to benefit itself, although the plaintiff would be thereby injured, there would be no more reason for allowing such damages than there would be in a suit by one party to a contract against the other for breach of it. . . .' " (Emphasis in original). 275 Md. at 44.

Because the taxpayers had only showed negligence, not actual malice, the Court disallowed punitive damages.

More recently, in *Aeropesca Ltd. v. Butler Aviation, supra,* we observed that:

"The Court of Appeals in three relatively recent cases, *General Motors Corp. v. Piskor,* 281 Md. 627, 381 A.2d 16 (1977); *Wedeman v. City Chevrolet Co.,* 278 Md. 524, 366 A.2d 7 (1976); *H & R Block, Inc. v. Testerman,* 275 Md. 36, 338 A.2d 48 (1975), expounded in depth on the subject of awarding punitive damages in fraud cases. The Court emphatically stated that *when the tort of fraud arises out of a contractual relationship the party seeking recovery must establish actual malice in order to recover punitive damages.* Although punitive damages were allowed in *Wedeman,* the Court carefully noted that the fraud existent in that

case 'did not arise out of a contractual relationship, but instead induced appellant to enter into the contract....." *Wedeman v. City Chevrolet Co., supra* at 529-30, 366 A.2d at 11. In short, the fraud in *Wedeman* preceded the contract and was the reason for the contract. The *Wedeman* Court declared that when the fraud does not arise out of a contract, the plaintiff does not have to prove actual malice but will establish his claim if he shows implied malice." 44 Md. App. at 624-25.

Wedeman purchased a demonstration automobile, relying on the dealer's assurance that it had "never been involved in an accident or damaged in any way." After the purchase, Wedeman then obtained evidence that the dealer's statement was false.

Relying on *Testerman, supra,* we held that since the fraud arose out of the contractual relationship, proof of actual malice was required to recover punitive damages. Since no actual malice had been established, we held that the trial judge erred by submitting the punitive damage issue to the jury. Reversing, the Court of Appeals pointed out that the dealer's fraud did not arise out of a contractual relationship, as in *Testerman,* but induced Wedeman's entry into the contract.

"What we meant in *Testerman* by a tort arising out of a contractual relationship is exemplified not only by the factual situation there, but also in the several cases on which we primarily relied there for our holding. *See, e.g., Siegman v. Equitable Trust Co.,* 267 Md. 309, 314, 297 A.2d 758 (1972) (conversion of checking account funds); *Daugherty v. Kessler,* 264 Md. 281, 284, 286 A.2d 95 (1972); (tortious interference with contract); *St. Paul at Chase v. Mfrs. Life Insur.,* 262 Md. 192, 236-39, 278 A.2d 12, *cert. denied,* 404 U.S. 857 (1971) (breach of contract and negligent performance of contractual obligation); *Damazo v. Wahby,* 259 Md. 627, 638-39,

270 A.2d 814 (1970) (tortious interference with contract); *Knickerbocker Co. v. Gardiner Co.,* 107 Md. 556, 569-70, 69 A. 405 (1908) (tortious interference with contract); *cf. Rinaldi v. Tana,* 252 Md. 544, 250 A.2d 533 (1969) (tortious interference with contract). Those cases, together with *Food Fair Stores v. Hevey,* [275 Md. 50] and *Henderson v. Maryland Nat'l Bank,* [278 Md. 514] ... had in common one salient fact: the contractual relationship preexisted the tortious conduct. Thus, *the tort found its source in the contract without which the wrong would not have been committed. It was in this context that we spoke in Testerman of a 'tort arising out of a contractual relationship,'* and to which our holding there is applicable. Thus, when one may be induced by fraud to enter into a contract, the tort in that instance cannot be said to arise out of the contractual relationship." *Wedeman v. City Chevrolet Co.,* 278 Md. 524, 528-29 (1976) [1] (Emphasis added.)

Based on the foregoing, we hold that when one party fraudulently induces another to enter into a contract, proof of implied malice may permit recovery of punitive damages. This standard applies even if the parties had a prior contractual relationship that is not the subject of the fraud claim. This holding is consistent with the purpose of punitive damages, as described by the *Wedeman* Court:

"Punitive damages are more likely to serve their deterrent purpose in a fraud case than in most other instances of tortious conduct. One who acts out of

---

1. In General Motors v. Piskor, 281 Md. 627, 637 (1977), the Court examined the line of cases cited in Wedeman and found: "A common thread runs through all these cases. In each instance, the tortious conduct and the contract were so intertwined that one could not be viewed in isolation from the other." The Court concluded, "In order, then, for an alleged wrong to constitute a 'tort arising out of a contractual relationship,' thereby necessitating proof of common law actual malice to permit recovery of punitive damages, we require that there be a direct nexus between the tortious act and performance or breach of the terms and conditions of the parties' underlying contract." *Id.* at 640.

anger or hate in committing an assault, for example, is not apt to be deterred by a fear of punitive damages. Those who are tempted, however, to engage deliberately in fraudulent conduct for profit are more likely to pause and consider the consequences if made aware that they may be compelled to pay more than the actual loss sustained by the plaintiff." 278 Md. at 531-32.

In this case, NMS proved to the jury's satisfaction that OCE fraudulently induced it to enter into the written contract by falsely promising not to compete. The prior oral agreement between the parties was a separate contractual relationship, not the subject of the fraud claim; the parties could have entered into the written contract even if there had been no previous oral agreement. *See State of Maryland, Department of General Services v. Holtman,* 296 Md. 403 (1983). Consequently, the fraud did not arise out of the prior contractual relationship; NMS was only required to prove that OCE acted with implied malice in order to claim punitive damages.

### b.

The trial court should not have disposed of NMS's claim for punitive damages by summary judgment. Disposition by summary judgment is generally inappropriate in cases involving motive or intent, *DiGrazia v. County Exec. for Mont. Co.,* 288 Md. 437, 445 (1980); whether a party's motive or intent amounts to malice is generally a jury question. *Berkey v. Delia,* 287 Md. 302, 324-26 (1980). In resolving this question, the jury may infer malice from the defendant's (or counter-defendant's) acts and surrounding circumstances. *Henderson v. Maryland Nat'l Bank, supra,* 278 Md. at 522. *See Staub v. Staub,* 37 Md. App. 141, 147 (1977).

In this case, NMS alleged (and later proved) that OCE violated its oral promise not to compete before asking NMS to enter into a written contract. From this violation, a jury

could (and did) infer that when OCE asked NMS to enter into the written contract, it promised not to compete, intending all the while to violate this promise. A jury could further find that OCE's actions were motivated by a desire to maximize profit in knowing disregard of NMS's interest; this would warrant a finding of implied malice, albeit not actual malice. *See Aeropesca Ltd. v. Butler Aviation, supra,* 44 Md. App. at 627 (finding of trial court). Thus, since there was sufficient evidence of implied malice to take this issue to the jury, the trial court should not have precluded NMS's claim for punitive damages by summary judgment.

## IV.

### *OCE'S CONTRACT ACTION FOR GOODS SOLD AND DELIVERED*

Prior to trial the trial judge granted a summary judgment in favor of OCE in the amount of $22,535.64, due from NMS for goods sold and delivered to NMS from July 1977 through June 1978. Appellant, NMS, argues that the judgment should have been entered in its favor because OCE had, since 1974, repudiated and materially breached the agreement between the parties. Appellant further contends that

> "The principal legal question for consideration by this Court is whether OCE, having committed a fraud and evidencing no intention to honor its contractual promise not to compete, can recover under its declaration against NMS for breach of contract."

One party may not recover from another party under a contract unless the former has performed or is ready and willing to perform. To support this proposition appellant cites *Wischhusen v. American Medicinal Spirits Co., Inc.,* 163 Md. 565 (1933); *Eno Cotton Mills v. Mudge,* 139 Md. 302 (1921) and *Weiss v. Northern Dredge & Dock Co.,* 155 Md. 351 (1928). We find none of these cases apposite. We agree

with the appellee that *Brown v. Fraley,* 222 Md. 480 (1960) controls our disposition of this issue. In *Brown* Chief Judge Brune set out at pages 485 and 486 the holding that supports our affirming the trial court's grant of OCE's motion for summary judgment:

"The Chancellor found that the contract of sale was divisible and therefore held that the breach of the clause prohibiting competition by Fraley would not excuse Brown from making the payments required by the contract. As Williston points out (3 Williston, *Contracts* § 872 (Rev. Ed.)), a contract for the sale of chattels at a fixed price may also contain other promises for which no price is fixed. He gives as an example (at p. 2452) 'a contract for the purchase of goods [in which] there may be a promise for an agency or an exclusive market or for freedom from competition' and says of such a contract: 'Breach of such a promise will not excuse the buyer from paying the contract price for property which he has received, nor will breach of a promise to assist in the resale of the goods sold. * * * It may be urged that frequently the defendant would not have agreed to pay this price except on the assumption that the other promises in the contract were to be kept. This is true and because it is true the injured party should be allowed to refuse to go on with the bargain if it is still wholly executory and should be allowed to rescind it even though executed, if he can restore to the other party the performance which has been received. * * * But so long as the defendant has received and retains the performance for which he promised to pay a fixed sum, it is going in the teeth of the express terms of the contract to excuse him from liability. Under such circumstances he must seek redress for non-performance of other promises in a cross-action or counterclaim, and this is true even though without fault on his part, he is unable to put the

other party in *statu quo* by returning the performance which he has received.' Williston, *supra,* pp. 2452-55. The following cases support this statement of the law: *Tichnor Bros. v. Evans,* 92 Vt. 278, 102 A. 1031; *Mark v. Stuart-Howland Co.,* 226 Mass. 35, 115 N.E. 42; *Springfield Seed Co. v. Walt,* 94 Mo. App. 76, 67 S.W. 938."

## VI.

## *DEPOSITION COSTS*

Finally, appellant argues that the trial court abused its discretion when it failed to award NMS deposition costs of $1,985.50. Maryland Rule 415 a provides:

"a. In Evidence.

The cost of a deposition admitted in evidence shall be taxed as part of the costs of the case, unless the court on motion shall disallow the same or otherwise apportion the costs between the parties."

There is no dispute that the depositions were admitted in evidence and, therefore, fall within the above rule.

Since we have affirmed the summary judgment in favor of the appellee on its declaration against the appellant, and since our holding in this case reinstates the judgment in favor of the appellant, we direct that the apportionment of costs as previously set out by the trial court shall remain.

> *Judgment n.o.v. vacated; summary judgment on punitive damages vacated; summary judgment on appellee's declaration affirmed; costs of pretrial depositions to be divided equally between the parties; case remanded for a jury determination of damages in accordance with this opinion.*
>
> *Costs of this appeal to be divided equally between the parties.*